**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| **GLEN HENDREN DRIVE HEALTHCARE LLC d/b/a LIBERTY HEALTH AND WELLNESS** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No. 4:25-cv-162** |
| **DOROTHY FINK, ACTING SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,** | ) | |
| **STEPHANIE CARLTON, ACTING ADMINISTRATOR OF THE CENTERS FOR MEDICARE AND MEDICAID SERVICES,** | ) | |
| **MISSOURI DEPARTMENT OF HEALTH AND SENIOR SERVICES,** | ) | |
| **AND** | ) | |
| **MISSOURI DEPARTMENT OF SOCIAL SERVICES** | ) | |
| **Defendants.** | ) | |

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

COMES NOW Plaintiff Glen Hendren Drive Healthcare LLC d/b/a Liberty Health and Wellness and for its cause of action states:

## I. INTRODUCTION

1. Plaintiff Glen Hendren Drive Healthcare LLC d/b/a Liberty Health and Wellness, (hereinafter "Liberty," "Facility," or "Plaintiff"), a skilled nursing facility, brings this action to enjoin Defendants from violating its statutory and constitutional rights by terminating it from the federal Medicare Program and the joint federal-state Medicaid Program on March 7, 2025 on only

15-days' notice. As is set forth below, the termination directly violates specific provisions of the Medicare and Medicaid Acts which provide that nursing facilities may be terminated only where conditions at the Facility pose the danger of "immediate jeopardy to resident health and safety" and only if the Facility has failed to correct alleged deficiencies.

2. If Liberty is terminated as a Medicare and Medicaid provider, its 124 frail, elderly and mentally ill residents will need to be immediately relocated from the Facility, some to hospitals or other inappropriate settings, resulting in irreparable injury to Liberty's residents, their families, to Liberty itself, to its employees, and to the community. In order to avoid this serious and irreparable injury, the Facility requests this Court to enjoin the Secretary from terminating its Medicare and Medicaid participation agreement for the care of Liberty's residents until the Facility is provided due process of law and the other procedural protections to which it is entitled by law.

## II. JURISDICTION AND VENUE

3. This is a civil action arising under the Medicare Act, 42 U.S.C. §§ 1395, et seq.; the Medicaid Act, 42 U.S.C. §§ 1396, et seq., the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02; and the Constitution of the United States. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343 and 1361, and 42 U.S.C. § 405(g). Venue is proper under 28 U.S.C. § 1391.

## III. PARTIES

4. Plaintiff operates a skilled nursing facility in Liberty, Missouri. The Facility cares for many frail elderly patients and undertakes to serve the least advantaged members of the community. Almost all of the Facility's residents are Medicare or Medicaid beneficiaries.

5. Defendant Dorothy Fink, Acting Secretary of the United States Department of Health and Human Services ("Secretary") is the Secretary of the department which is statutorily responsible for the administration of the Medicare Act, 42 U.S.C. § 1395, et seq., and the

administration of federal responsibilities under the Medicaid Act, 42 U.S.C. § 1396, et seq. The Acting Secretary is sued in an official capacity.

6. Defendant Stephanie Carlton, Acting Administrator for the Centers for Medicare and Medicaid Services ("CMS") is a federal agency organized under the laws of the United States and is the Secretary's designated agent for administering the Medicare and Medicaid Programs and making final administrative decisions with respect to those programs. The Acting Administrator is sued in an official capacity.

7. Defendant Missouri Department of Health and Senior Services ("MDHSS") is an agency of the State of Missouri. MDHSS has entered into a contract with the Secretary under which it has been designated as Missouri's state survey agency. State survey agencies (known as the "state survey agency" or "SSA") contract with the Secretary to survey skilled nursing facilities ("SNFs") and to make findings and recommendations to the Secretary regarding each SNF's compliance with regulatory requirements for participation ("ROPs") in the Medicare and Medicaid Programs. The Section for Long Term Care Regulation is the division or sub-agency of MDHSS that is responsible for survey and enforcement of skilled nursing facilities.

8. Defendant Missouri Department of Social Services ("MDSS") is an agency of the State of Missouri, which has been designated by the state as its single state agency with responsibility to administer Missouri's Title XIX (Medicaid) reimbursement program, known as MO HealthNet. The Missouri Medicaid Audit and Compliance Unit ("MMAC") is within MDSS.

9. Defendants Secretary, CMS, MDHSS, and MDSS, are collectively referred to as Defendants in this pleading.

## IV. STATUTORY AND REGULATORY BACKGROUND

### The Medicare and Medicaid Programs

10. The Medicare Program is a federal health insurance program for the aged, under which qualified health care providers, including skilled nursing facilities ("SNFs" or "facilities"), are reimbursed by the federal government for the treatment and care they provide to Medicare Program beneficiaries. The Medicaid Program is a cooperative state-federal program that provides medical assistance, including nursing facility benefits, to needy persons. Both the federal and state governments jointly fund the Medicaid Program.

11. Facilities such as Liberty that wish to "participate" in the Medicare or Medicaid Programs must enter into written "provider agreements" with the Secretary and with the state agency responsible for administering a particular state's Medicaid program. In Missouri, the designated Medicaid Agency is the Department of Social Services.

12. Facilities that participate in the Medicare and/or Medicaid Programs must be "certified" for such "participation" pursuant to federal regulations set forth in 42 C.F.R. §§ 483.1, *et seq*. (Medicare) and 42 C.F.R. §§ 442.1, *et seq*. (Medicaid). These requirements, commonly known as the Requirements of Participation ("ROPs"), set forth numerous physical plant, staffing, resident rights, clinical, and operational requirements.

### The Survey Process

13. SNFs that participate as Medicare or Medicaid providers are required to be inspected (or "surveyed") at least once every 15 months to verify they are in substantial compliance with the ROPs.

14. Under 42 U.S.C. § 1395aa, the Secretary is authorized to enter into agreements with state agencies (known as "state survey agencies" or "SSAs") to conduct these surveys. The Secretary has entered into such agreement with MDHSS.

15. Federal regulations and the agreement between MDHSS and the Secretary require MDHSS to conduct SNF surveys using the survey forms, procedures, and methods prescribed by the Secretary. 42 C.F.R. § 488.318(a)(iii)-(iv).

16. The certification requirements for SNFs participating in the Medicare or Medicaid Program are prescribed by federal regulations. 42 C.F.R. § 483.1, *et seq*. However, no currently effective federal regulation sets forth the survey methods, procedures, and forms that state survey agencies must use in determining whether a SNF complies with the ROPs. The only lawfully promulgated and published regulations that set forth the survey methods, procedures, and forms for surveying Medicare and Medicaid nursing facilities are set forth at 42 C.F.R. § 488, Subpart C, which the Secretary published only after a federal district court in Colorado issued several orders requiring it. The Secretary has disavowed these regulations, although they have never been repealed, and MDHSS did not use them to survey the Facility.

17. Instead, the Secretary has set forth the survey methods, procedures, and forms used to conduct surveys, including those which MDHSS used to survey the Facility, in a manual referred to as the "State Operations Manual" (or "SOM").

18. In addition to setting forth the survey methods, procedures, and forms to be used by state survey agencies, the SOM also includes a number of appendices that detail CMS's interpretations of the requirements of participation for the various provider types. Appendix PP of the SOM, which is 873 pages, sets forth CMS's interpretation of the SNF ROPs.

19. Using these informal guidance documents, surveyors may cite as a "deficiency" any instance in which they determine – by observation, interview, record review, or any other means – that a certified facility has not maintained "substantial compliance" with a regulatory requirement. Because the survey process is so comprehensive, nearly all of the approximately 14,800 certified nursing facilities are cited for "deficiencies" at some point. Data for 2024 shows that 95% of facilities were cited for deficiencies, with 9.5 average number of deficiencies per certified nursing facility.

**The Enforcement Process**

20. 42 U.S.C. § 1395i-3(h) sets forth an "enforcement" scheme that assigns sanctions to various levels of noncompliance, which the Secretary classifies according to four levels of "severity" and three of "scope," as measured by "potential" or "actual" harm to residents. *See* 42 C.F.R. § 488.404. The scope and severity are assigned using letters ranging from A-L, with A, B, and C constituting the lowest severity level, and J, K, and L constituting the highest severity levels.

21. The statute authorizes the Secretary to impose sanctions ranging from "termination" from the Medicare and Medicaid Programs in the most serious cases (or for noncompliance that persists uncorrected for more than six consecutive months), to civil monetary penalties, denials of payment for new admission, directed plans of correction, and others, for less serious noncompliance. The details of the enforcement process are set forth in regulations at 42 C.F.R. Part 488.

22. Prior to 1987, the only sanctions (referred to as "remedies") available to the Secretary for any noncompliance by a SNF with any regulatory requirement, no matter how minor, was termination of the Facility from the Medicare and Medicaid Programs, or a ban on new admissions. In 1987 Congress, concerned that these remedies were ineffective to address most

noncompliance that was relatively minor, enacted nursing home reform legislation in various provisions of the Omnibus Budget Reconciliation Act of 1987 ("OBRA 1987"), Pub. L. No. 100-203, § 4201, et seq. (These provisions are scattered throughout 42 U.S.C. §§ 1395 [Medicare] and 1396 [Medicaid]). Among other things, Congress gave the Secretary authority to impose several new remedies, including civil money penalties, state monitoring, temporary management, directed plans of correction, and others. Congress specifically assigned certain remedies to certain levels of noncompliance to assure that remedies were employed effectively to address deficiencies. The Medicare and Medicaid acts, as amended in 1987, now specifically provide that termination is to be used only in the most serious cases – those where conditions at a facility pose "serious and immediate jeopardy to resident health and safety." 42 U.S.C. § 1395i-3(h) (Medicare) provides in pertinent part:

> (2) SECRETARIAL AUTHORITY. (A) IN GENERAL. – With respect to any skilled nursing facility in a State, if the Secretary finds, or pursuant to a recommendation of the State under paragraph (I) finds, that a skilled nursing facility no longer meets a requirement of subsection (b), (c), (d), or (e), and further finds that the facility's deficiencies –
>
> (i) immediately jeopardize the health or safety of its residents, the Secretary shall take immediate action to remove the jeopardy and correct the deficiencies through the remedy specified in subparagraph (B)(iii), or terminate the facility's participation under this title [42 U.S.C. §§ 1395, et seq.] and may provide, in addition, for one or more of the other remedies described in subparagraph (B); or
>
> (ii) do not immediately jeopardize the health or safety of its residents, the Secretary may impose any of the remedies described in subparagraph (B).
>
> ***
>
> (B) SPECIFIED REMEDIES. – The Secretary may take the following actions with respect to a finding that a facility has not met an applicable requirement:

> (i) DENIAL OF PAYMENT. – The Secretary may deny any further payments under this title [42 U.S.C. §§ 1395, et seq.] with respect to all individuals entitled to benefits under this title [42 U.S.C. §§ 1395, et seq.] in the facility with respect to such individuals admitted to the facility after the effective date of the finding.
>
> (ii) AUTHORITY WITH RESPECT TO CIVIL MONEY PENALTIES. – The Secretary may impose a civil money penalty in an amount not to exceed $10,000 for each day of noncompliance. …
>
> (iii) APPOINTMENT OF TEMPORARY MANAGEMENT. – In consultation with the State, the Secretary may appoint temporary management to oversee the operation of the facility and to assure the health and safety of the facility's residents, where there is a need for temporary management while –
>
> > (I) there is no orderly closure of the facility, or
> >
> > (II) improvements are made in order to bring the facility into compliance with the requirements of subsections (b), (c) and (d).

23. Congress specified that termination is a last-resort remedy to be imposed only in cases of immediate jeopardy because termination necessitates relocation of a facility's residents, which itself may cause serious and irreparable harm (possibly including death for the most vulnerable patients) to frail or elderly residents.

24. In 1987, Congress also enacted a parallel termination statute for Medicaid termination, 42 U.S.C. § 1396r(h)(3). This statute also precludes the Secretary from terminating a nursing facility from the Medicaid program when the facility's deficiencies do not pose "immediate jeopardy" to the health or safety of the facility's residents.

25. Notwithstanding these clear statutory limitations, the Secretary takes the position, and the SOM provides, that the Secretary may terminate any facility for any deficiency, regardless of whether the deficiency poses "immediate jeopardy."

26. When the Secretary decides to terminate the Medicare and Medicaid Program participation of a SNF (whether or not there is immediate jeopardy), the Secretary requires state survey agencies to comply with the termination procedures set forth in the SOM. 42 C.F.R. § 488.456.

27. A SNF that is terminated from the Medicare Program is entitled to appeal the termination decision and present its case in a hearing before a federal administrative law judge who is without stay authority. However, such an appeal hearing does not occur until *well after* termination from the Medicare program is complete and the Facility's Medicare and Medicaid patients have been forced to relocate. In addition, the scope of a SNF's appeal of a termination decision is extremely limited: the facility may appeal only the particular allegations of non-compliance to the termination, but not the Secretary's decision to impose a termination rather than some other remedy. In other words, the facility is not permitted to assert on appeal that it may have had some deficiencies, but that they did not justify imposition of the most severe remedy available – termination. *See* 42 C.F.R. § 498.3(d)(11). The facility also is precluded from challenging in an administrative appeal the legality or constitutionality of the regulatory processes by which the survey was administered or the termination decision was reached.

**Special Focus Facilities Program**

28. Under 42 U.S.C. § 1395i-3(f)(8)(A) and § 1396r(f)(10)(A), the Secretary is required to conduct a special focus facility program for enforcement of requirements for skilled nursing facilities that the Secretary has identified as having substantially failed to meet applicable

requirements governing such facilities. Facilities in the program are required to be surveyed once every 6 months, as opposed to once every 15 months (the standard for all other participating facilities).

29. The rules and standards governing the Special Focus Facilities ("SFF") Program are not described in any regulation or even CMS manual. Rather, the SFF Program has been implemented exclusively through informal memoranda sent to state survey agency directors by the CMS Center for Clinical Standards and Quality.

30. Facilities have no ability to challenge or appeal placement in the SFF Program.

31. Further, a facility's disagreement with the accuracy or appropriateness of a citation that is the basis for being placed (or kept) in the SFF Program is immaterial under the informal memoranda.

32. On March 2, 2017, the Director for the Survey and Certification Group issued a memorandum to state survey agency directors (S&C: 17-20-NH) identifying rules and standards governing the SFF Program. Under this memorandum, the state survey agency would survey the facilities every six months and recommend progressive enforcement until the facility either graduates from the SFF Program or is terminated from the Medicare and/or Medicaid programs. To graduate, the memorandum provides that the facility must complete two consecutive standard surveys with no deficiencies cited at a scope and severity level of "F" or greater and must have had no complaint surveys with deficiencies cited at "F" or greater in between those two standard surveys. If a facility in the program has three standard surveys, where the most recent standard survey results in deficiencies cited at "F" or greater, then there must be a "last chance" survey.

33. On October 21, 2022, the Director for Quality, Safety & Oversight Group ("QSOG") issued a memorandum (QSO-23-01-NH) revising the SFF Program standards, which is

the last memorandum issued by CMS concerning the SFF Program. The memorandum changed the graduation criteria, making it more difficult for facilities to graduate. Under the new criteria, a facility would only be able to graduate if it had two consecutive standard health surveys with 12 or fewer deficiencies cited at scope and severity level of "E" or less. This current memorandum indicates that CMS may impose enforcement actions for failure to demonstrate sustained improvements or demonstrate a good faith effort to improve quality. Examples of actions to demonstrate a good faith effort to improve quality include "measurable and sustained operation changes (e.g., leadership or other key staffing changes, increased staffing levels, etc.)."

## V. FACTUAL BACKGROUND

34. Liberty is a facility licensed by the State of Missouri to provide skilled nursing facility (SNF) services and which participates in the Medicare and Medicaid programs.

35. On April 26, 2022, the Facility was placed on the SFF Program. At that time, the Facility was operated by a different company, LHW OP LLC. LHW OP LLC operated the Facility from February 1, 2020, to June 1, 2023. Goldner Capital Management LLC, owned by the Goldner Family Trust, had a majority membership interest in LHW OP LLC.

36. On June 1, 2023, Plaintiff Glen Hendren Drive Healthcare LLC purchased the operations of the Facility from LHW OP LLC. Vertical Health Services LLC, owned by William Miller, has a majority membership interest in Glen Hendren Drive Healthcare LLC.

37. William Miller has no relationship or connection with Goldner Family Trust. William Miller is based in Washington State and has been working in long term care since 1993, starting in laundry and maintenance. He is currently Vice Chair of the Washington Health Care Association, the trade association for most long-term care facilities in that state.

38. After being placed into the SFF Program, the Facility had numerous poor surveys under the prior operator.

39. The first survey performed after the change in ownership was on October 16, 2023, and showed significant improvement. Had the SFF Program graduation criteria that existed at the time the Facility was placed into the SFF Program been applied, the Facility would have graduated from the SFF Program as a result of this survey because it had no deficiencies cited at the scope and severity of "F" for two consecutive standard surveys. However, CMS applied the revised graduation criteria that was put into place after the Facility was placed into the SFF Program.

40. The Facility had its next standard survey on April 23, 2024, which also included a complaint investigation related to a self-report made by the Facility concerning potential misappropriation of resident property by a terminated employee. As a result of this self-reported incident, the Facility was cited with two deficiencies at the "G" scope and severity level – F602 and F745. The deficiency cited at F602 was cited as "past non-compliance," meaning the Facility corrected the deficiency prior to surveyors arriving to conduct the survey.

41. The Facility disagreed with these cited deficiencies and the scope and severity of "G" assigned to the deficiencies. Therefore, the Facility requested an Informal Dispute Resolution (IDR) hearing to challenge both deficiencies. As the name implies, it presents a facility an opportunity for an informal reconsideration of the deficiency cited. As a result of the IDR, the deficiency cited at F745 was lowered to the "D" scope and severity level. On January 10, 2025, CMS issued a civil monetary penalty related to the remaining G-level deficiency (F602). The Facility elected to use CMS's independent informal dispute resolution ("IIDR") process to challenge this G-level deficiency. The written materials for the IIDR were submitted on February

10, 2025. The decision on this IIDR is currently pending. The entity that handles IIDRs, Health Quality Innovators, has 60 days to issue its recommendation with respect to this deficiency.

42. If the IIDR reviewer recommends that the F602 deficiency be removed or the scope and severity lowered, and CMS accepts this recommendation, it would mean the Facility would have met the criteria for graduation from the SFF Program as of April 23, 2024, under the current SFF Program memorandum.

43. The next survey after the April 24, 2024, survey occurred on October 23, 2024. This survey resulted in 13 tags cited at the D and E level.

44. Thereafter, on January 24, 2025, MDHSS performed a complaint investigation of the Facility related to a resident fall that occurred during therapy on December 17, 2024. The state survey agency had received a video from the resident's daughter, in which the resident stated that the therapists were 15 feet away from her at the time of her fall. The surveyor performing the complaint investigation was new, had no clinical experience or education, and was most recently a food manager for Tyson Foods prior to becoming a surveyor.

45. With respect to the fall, the resident was standing at the parallel bars with a gait belt during therapy, with the physical therapy assistant ("PTA") standing to her left having 2 points of contact, and the Certified Occupational Therapy Assistant ("COTA") to her right sitting at her knee level. The therapy staff heard a pop, the resident's knee buckled (believed to be the result of a pathological fracture). The Facility immediately transferred her to the hospital. Timely and accurate entries were made in the medical chart detailing the event, and a thorough investigation was conducted by the facility, including obtaining the statements of three eyewitness therapy providers and an eyewitness resident. The contemporaneous chart entries and investigation demonstrated, without exception, that the Facility's therapy staff provided precisely the prescribed

hands-on assistance warranted, and the investigation was concluded. Not until the January 2025 survey did the daughter's video surface in which the daughter was asking her mother questions about the fall while the resident was at the hospital and under the effects of intravenous narcotic medications. The resident stated in the video that the therapy staff were 15 feet away, but this is inaccurate based on the Facility's investigation, as well as the size of the room and location of the parallel bars.

46. Despite the Facility's internal investigation showing the video statement was inaccurate, the Facility was informed by the surveyor that it was being cited with a deficiency (F689) related to the fall, which the surveyor alleged constituted immediate jeopardy at the "J" scope and severity level. This citation was based exclusively on the video created by the resident's daughter, who was not the resident's responsible party, while the resident was under the effects of heavy narcotics.

47. By letter dated February 10, 2025, MDHSS formally notified the Facility of its deficiency findings from the January 24, 2025, survey, and requested that a plan of correction be submitted within ten (10) working days. The letter also indicated that the Facility could question the cited deficiencies through an IDR process. Significantly, the letter stated: "It has also been determined that the conditions in your facility that constituted immediate jeopardy **had been lowered to isolated deficiencies that constitute actual harm that is not immediate jeopardy, prior to the exit conference for the survey**" (emphasis added). The Statement of Deficiencies repeated this determination and further stated: "A revisit will be conducted to determine if the facility is in substantial compliance with participation requirements." A true and accurate copy of the February 10 letter from MDHSS, along with its enclosure (the "statement of deficiencies" or "2567"), is attached hereto as Exhibit 1 and incorporated herein.

48. On February 13, 2025, the Facility submitted its plan of correction to MDHSS, indicating that the deficiencies cited during the January 24, 2025, survey had all been corrected by February 11, 2025. A true and accurate copy of the Facility's plan of correction submitted to MDHSS, is attached hereto as Exhibit 2 and incorporated herein.

49. That same day, the Facility also submitted a request to challenge the cited deficiencies through the IDR process. The IDR is currently scheduled for March 12, 2025. The Facility strongly opposes the deficiency cited, as well as the allegation that residents were placed in immediate jeopardy, based on its internal investigation that included documentation from the resident's medical record and multiple eyewitness accounts.

50. On February 14, 2025, MDHSS sent the Facility a letter indicating that the Facility's plan of correction was acceptable as submitted and that a re-inspection would be conducted within 60 days of the original inspection to determine if the cited violations have been corrected in accordance with the approved plan. A true and accurate copy of the February 14 letter from MDHSS is attached hereto as Exhibit 3 and incorporated herein.

51. Thereafter, on February 20, 2025, CMS notified the Facility that its participation in the Medicare program was being involuntarily terminated effective March 7, 2025, as a result of the F689 deficiency cited during the January 24 survey. The letter further stated: "No revisit survey will be conducted for Liberty Health and Wellness." This letter was received after MDHSS indicated a revisit *would* be conducted pursuant to its February 14 letter. A true and accurate copy of the February 20 letter from CMS is attached hereto as Exhibit 4 and incorporated herein.

52. The pending IIDR related to the G-level deficiency from the April 23, 2024, survey, and the pending IDR related to the J-level deficiency from the January 24, 2025, survey could result in the underlying basis for CMS's termination to substantially change. If the G-level

deficiency (F602) from the April 23, 2024, survey was removed or downgraded in scope and severity as a result of the IIDR, the Facility would have met the criteria for graduating from the SFF Program. If the J-level deficiency cited during the January 24, 2025, survey (F689) were removed or downgraded in scope and severity as a result of the pending IDR, there would be no basis to terminate the Facility's Medicare participation.

53. Between February 20, 2025, and March 3, 2025, multiple communications were made by the Facility to CMS representatives, HHS representatives, and MDHSS requesting reconsideration of the involuntary termination decision. The Facility requested that CMS allow MDHSS to perform a revisit survey to confirm the corrections with respect to the alleged deficiencies cited at the January 24 survey had been made, and asking for alternative remedies to be used under the circumstances, but CMS refused. The Facility requested that CMS delay the termination date to allow for resolution of the pending IIDR and IDR, but CMS refused. True and accurate copies of the written communications are attached hereto as Exhibit 5 and incorporated herein.

54. CMS has refused to consider the fact that the Facility is under the operation of a completely new company than the company that was operating the facility at the time it was placed into the SFF Program. The immediate jeopardy deficiency cited on January 24, 2025, was the <u>first</u> immediate jeopardy deficiency under the new operator's watch.

55. Despite the pending IIDR and IDRs related to the deficiencies that prompted the immediate termination by CMS, CMS and MDHSS forced the Facility to begin transferring Medicare and Medicaid residents out of the building starting on February 25, 2025.

56. A revisit has not been conducted by MDHSS with respect to the deficiencies cited during the January 24, 2025, survey. Therefore, CMS issued its immediate termination letter on

February 20, 2025, without confirming that the Facility was or was not in substantial compliance with respect to the deficiencies cited on January 24, 2025, for which MDHSS had already approved a plan of correction that indicated all deficiencies had been corrected by February 11, 2025.

57. There are currently many other facilities in the SFF Program that have: (1) been on the program longer than the Facility; and (2) have received multiple substandard care or immediate jeopardy citations while on the SFF Program. These facilities are not currently being terminated by CMS.

58. In addition to the pending IIDR and IDR related to the deficiencies that prompted this termination, the Facility has also appealed those survey findings to the CMS Departmental Appeals Board ("DAB"), requesting an expedited hearing.

59. Federal regulations require that, if CMS terminates a nursing home's Medicare agreement, the state Medicaid program must terminate the nursing home's Medicaid agreement. 42 CFR § 488.456.

60. Plaintiff has implemented measures to address and remove any and all alleged immediate concerns for the health, safety, and welfare of its residents. In addition, Plaintiff has set forth its plan to ensure that it is in compliance with all federal regulations and to correct the deficiencies cited in the January 24, 2025, survey, which MDHSS accepted. Defendants have represented to Plaintiff that they nonetheless still intend to terminate the Facility's Medicare and Medicaid participation on March 7, 2025.

61. By seeking to terminate the Facility from the Medicare and Medicaid programs after having determined that imminent danger to the resident's health, safety, and welfare (or immediate jeopardy) no longer exists at the Facility, Defendants have violated the applicable statutes and their own policies and procedures.

## VI. IRREPARABLE INJURY

62. The Defendants' proposed termination of Liberty's participation in the Medicare and Medicaid Programs, effective as of March 7, 2025, unless enjoined by this Court, will cause irreparable injury for which Plaintiff has no adequate remedy at law.

63. There were 124 residents at Liberty at the time the February 20 letter was received, and approximately 100 of them were Medicare or Medicaid beneficiaries.

64. If Liberty's Medicare and Medicaid participation agreements are terminated, all or nearly all of its residents would have to be relocated. *See* 42 U.S.C. § 1395i-3(h)(4).

65. The Facility's residents are elderly and nearly one-third have been residents for many years. Nearly one-third of the residents are considered high acuity. Many of the residents suffer from dementia, confusion, and anxiety.

66. The Facility is located in Clay County, which has the third highest need for skilled nursing facility beds in the state of Missouri, with 939 net bed need, based on data provided by the state's certificate of need program. Clay County is immediately adjacent to Jackson County, which has the second highest need for skilled nursing facility beds in the state, with a net bed need of 1,712.

67. Because of the resident characteristics and bed scarcity in the area, these residents will be forced to transfer to other facilities or locations much farther away from their families and friends.

68. Such relocation is more likely than not to subject the residents to "transfer trauma," a well-documented and judicially recognized complex of physical and psychological adverse effects – including death in some instances – caused by abrupt involuntary relocations of frail, elderly, or mentally ill persons from the facility that most perceive as their home.

69. Residents at the Facility have signed a petition strongly disagreeing with CMS's termination. Residents can currently be found crying in the Facility as a result of CMS's actions in this matter.

70. Moreover, the Facility currently employs 160 individuals. This includes 115 full time employees, 17 part-time employees, and 28 PRN (as needed) employees. Over half of these employees have worked at this Facility for over a year.

71. The loss of nearly all of its residents would have an obviously adverse effect on the Facility itself. As a practical matter, the Facility would have to close. Thus, the Facility's employees would lose their jobs and would disperse, making it unlikely that the Facility would be able to re-hire the employees in the event the IIDR or IDR are decided in the Facility's favor, effectively reversing the Medicare termination. Further, the referral sources would establish new referral relationships. In other words, this termination effectively destroys the Facility's business.

72. Lastly, the community would suffer with having one less skilled nursing facility, in the county which already has the third-highest need for skilled nursing facility beds.

## VII. STATEMENT OF CLAIMS

### COUNT I – VIOLATION OF MEDICARE ACT

73. Plaintiff realleges paragraphs 1 through 72 as if set forth in full.

74. Defendants have acted beyond their authority under the Medicare Act by terminating Liberty's participation in the Medicare Program in the absence of serious and immediate jeopardy as required for termination by 42 U.S.C. § 1395i-3(h)(2).

### COUNT II – VIOLATION OF MEDICAID ACT

75. Plaintiff realleges paragraphs 1 through 74 as if set forth in full.

76. Defendants have acted beyond their authority under the Medicaid Act by terminating Liberty's participation in the Medicaid Program in the absence of serious and immediate jeopardy, as required by 42 U.S.C. § 1396(h)(3).

**COUNT III – VIOLATION OF DUE PROCESS**

77. Plaintiff realleges paragraphs 1 through 76 as if set forth in full.

78. Defendants' purported termination of Plaintiff's Medicare and Medicaid program participation without affording the Plaintiff the opportunity to demonstrate it corrected the deficiencies cited on January 24, 2025, is a violation of the Plaintiff's Fifth Amendment due process rights, the Medicare Act, and the Administrative Procedure Act. CMS's regulations and guidance require that CMS provide an opportunity for a Facility to correct any cited deficiencies before its Medicare participation agreement terminates. Here, the state survey agency accepted the Facility's plan of correction, which indicated the Facility had corrected all deficiencies by February 11, 2025, and the state survey agency confirmed it would conduct a revisit to confirm the deficiencies had been corrected as indicated. Yet, CMS decided to terminate the Facility on February 20, despite the Facility's approved plan showing it was in substantial compliance as of February 11, 2025.

79. Furthermore, Defendants' purported termination of Plaintiff's Medicare and Medicaid program participation while there are two pending informal dispute resolution processes that could drastically change the underlying basis for Defendants' termination is a violation of the Plaintiff's Fifth Amendment due process rights, the Medicare Act, and the Administrative Procedure Act.

80. Defendants' purported termination of Plaintiff's Medicare and Medicaid program participation in excess of their statutory authority, which precludes Defendants from terminating

Plaintiff absent confirmation that Plaintiff immediately jeopardizes the health or safety of its residents, their multiple failures to comply with their own procedures requiring, among other things, use of survey methods, notification procedures, and forms that constitute substantive rules which are not published as regulations in accordance with the notice and comment requirements of the Medicare Act, Medicaid Act, and Administrative Procedure Act, 5 U.S.C. § 553 ("APA"), and their failure to apply existing, unrepealed published regulations governing the survey process, all constitute actions taken in violation of Plaintiff's rights to due process of law under the Fifth Amendment of the United States Constitution. Therefore, Defendants' proposed terminations of Plaintiff are illegal, void and of no effect.

**COUNT IV – VIOLATIONS OF THE MEDICARE ACT AND ADMINISTRATIVE PROCEDURE ACT**

81. Plaintiff realleges paragraphs 1 through 80 as if set forth in full.

82. The survey methods, procedures, and forms that the Defendants have applied in proposing to terminate Medicare/Medicaid funding to Liberty's residents are substantive rules that have not been published as regulations in accordance with the notice and comment requirements of the Medicare Act or APA, and are otherwise contrary to law because Defendants failed to provide an adequate statement of basis and purpose of the rule in violation of the APA. Defendants' actions thus violate the Medicare Act, 42 U.S.C. § 1395hh(a)(2), and the APA, 5 U.S.C. §§ 553 *et seq*. and 706. Consequently, Defendants' actions taken pursuant to those rules are illegal, void and of no effect.

83. The interpretive guidelines used by surveyors in enforcing the ROPs set forth in 42 C.F.R. Part 483 also constitute substantive rules that have not been published as regulations in accordance with the notice and comment requirements of the Medicare Act or APA and are otherwise contrary to law because Defendants failed to provide an adequate statement of basis and

purpose of the rule in violation of the APA. Defendants' actions thus violate the Medicare Act, 42 U.S.C. § 1395hh(a)(2), and the APA, 5 U.S.C. §§ 553 *et seq*. and 706. Consequently, Defendants' actions taken pursuant to those rules are illegal, void and of no effect.

84. The memoranda issued by the CMS Center for Clinical Standards and Quality likewise set forth substantive rules governing the Special Facility Focus Program and have not been published as regulations in accordance with the notice and comment requirements of the Medicare Act or APA, and are otherwise contrary to law because Defendants failed to provide an adequate statement of basis and purpose of the rule in violation of the APA. Defendants' actions thus violate the Medicare Act, 42 U.S.C. § 1395hh(a)(2), and the APA, 5 U.S.C. §§ 553 *et seq*. and 706. Consequently, Defendants' actions taken pursuant to those rules are illegal, void and of no effect.

**COUNT V – ARBITRARY AND CAPRICIOUS AGENCY ACTION**

85. Plaintiff realleges paragraphs 1 through 84 as if set forth in full.

86. Defendants' purported termination of Medicare/Medicaid funding for the care of Liberty's residents based upon (1) actions taken in excess of their statutory authority to terminate Plaintiff; (2) violations of their own procedures; (3) the use of unlawful, unpublished rules that are not published as regulations as required by the Medicare Act and APA; (4) failure to adequately consider the change of operator, bed need in the area, and the Facility's residents' petition; and (5) CMS's inconsistent application of its own procedures, as well as its unlawful, unpublished rules, was and is contrary to law, arbitrary, capricious and an abuse of discretion, in violation of 5 U.S.C. § 706(2). Consequently, Defendants' actions are illegal, void and of no effect.

**COUNT VI – VIOLATION OF THE PLAINTIFF'S RIGHT TO EQUAL PROTECTION**

87. Plaintiff realleges paragraphs 1 through 86 as if set forth in full.

88. Defendants have surveyed facilities, imposed remedies, and operated its SFF Program in a manner that has been so inconsistent that their purported termination of Plaintiff denies Plaintiff its rights under the Equal Protection Clause (Amendment 14) of the United States Constitution and due process of law in violation of the Fifth Amendment of the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court for the following relief:

A. Its order and judgment declaring that Defendants' termination of Medicare and Medicaid funding for the care of residents of Liberty in the absence of immediate jeopardy to the Facility's residents is in violation of the Medicare and Medicaid Acts;

B. Its order and judgment declaring that Defendants' failure to provide the Facility the opportunity to correct cited deficiencies and its use of ad hoc proceedings in this case have denied Liberty due process of law;

C. Its order and judgment declaring that Defendants' use of survey procedures, interpretive guidelines, and SFF Program criteria that have not been promulgated according to the notice and comment procedures of the Medicare Act and the Administrative Procedure Act is unlawful;

D. Its order and judgment enjoining and restraining Defendants and each of them preliminarily and permanently, from effecting or attempting to effect, any action terminating Medicare and Medicaid funding for the care of residents of Liberty based upon the illegal actions alleged above, until the Facility is provided due process of law and the other procedural protections to which it is entitled by law;

E. Its order and judgment enjoining and restraining Defendants and each of them preliminarily and permanently, from publishing any notice in any medium or by any means of an action to terminate Medicare and Medicaid funding for the care of residents of Liberty based upon the illegal actions alleged above, until the Facility is provided due process of law and the other procedural protections to which it is entitled by law;

G. Its order awarding Plaintiff its reasonable attorneys' fees incurred for bringing this action; and

H. Its order granting such other and further relief as the Court may deem just and proper.

Respectfully submitted,

HUSCH BLACKWELL LLP

By: /s/ Emily M. Solum

EMILY M. SOLUM MO Bar #65089
M. ELIZABETH LAFOE MO Bar #68191
630 Bolivar Street, Suite 300
Jefferson City, MO 65101
Telephone: 573-635-9118
Facsimile: 573-634-7854
Email: Emily.Solum@huschblackwell.com
Liz.LaFoe@huschblackwell.com

and
SCOTT MARTIN MO Bar #42370
JACOB N. REINIG MO Bar #72247
4801 Main Street, Suite 1000
Kansas City, MO 64112
Phone: 816-983-8000
Fax: 816-983-8080
Email: Scott.Martin@huschblackwell.com
Jake.Reinig@huschblackwell.com

**ATTORNEYS FOR PLAINTIFF GLEN HENDREN DRIVE HEALTHCARE LLC d/b/a LIBERTY HEALTH AND WELLNESS**

**VERIFICATION**

STATE OF MISSOURI )
) ss.
COUNTY OF Jackson )

Comes Now Amy Bax, Administrator for Glen Hendren Drive Healthcare, LLC, being of lawful age first duly sworn under oath, do state that I have personal knowledge of the facts stated in the Verified Complaint for Declaratory and Injunctive Relief, and I state that those facts are true to my best information, knowledge, and belief.

Amy Bax, Administrator

SUBSCRIBED in my presence and sworn to before me this 6th day of March, 2025.

Notary Public

My Commission Expires: January 12, 2029

MELODY WYZARD
Notary Public - Notary Seal
Jackson County - State of Missouri
Commission Number 13433274
My Commission Expires Jan 12, 2029