UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| GLEN HENDREN DRIVE HEALTHCARE, LLC d/b/a LIBERTY HEALTH AND WELLNESS | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 25-00162-CV-W-BP |
| DOROTHY FINK, ACTING SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.* | ) ) ) ) | |
| Defendants. | ) | |

## TEMPORARY RESTRAINING ORDER

Plaintiff Glen Hendren Drive Healthcare, LLC, d/b/a Liberty Health and Wellness, ("Liberty") is a facility licensed to provide skilled nursing services and houses over 120 residents, many of whom are Medicare or Medicaid beneficiaries. Defendants are terminating Plaintiff's Medicare/Medicaid certificate today, March 7, 2025, causing Liberty to shut down and force Plaintiff's residents to move out. Plaintiff claims this was done (1) in violation of a variety of federal and state laws involving Medicare and Medicaid, (2) in violation of the Equal Protection Clause, and (3) without sufficient due process. For the reasons set forth below, Plaintiff's Application for Temporary Restraining Order ("TRO"), (Doc. 4), is **GRANTED** through March 13, 2025. The Court will consider whether to extend the TRO further pending input from the parties.

## I. BACKGROUND

The Court conducted a telephone conference with the parties on the afternoon of March 7, 2025. In coming to the facts herein, the Court relies on representations made by the parties during

the telephone conference as well as allegations in Plaintiff's Verified Complaint, (Doc. 1), and Application for Temporary Restraining Order, (Doc. 4). The Court's conclusions are subject to change as Defendants are provided more time to respond.

The majority of Plaintiff's residents are beneficiaries of Medicare or Medicaid and rely on these programs to receive care at Liberty. The Medicare Program is a federal health insurance program supporting the elderly which, among other services, covers treatment in skilled nursing facilities for those who require it. The Medicaid Program is a joint federal and state program which provides, among other services, skilled nursing facility benefits to those who require them. Facilities in Missouri which participate in Medicare or Medicaid Programs are required to enter into "provider agreements" with the Secretary of the Department of Health and Human Services ("DHHS") and with Missouri Department of Social Services ("MDSS"); they must also be certified for participation pursuant to federal regulations, commonly known as the Requirements of Participation ("ROPs"), set out in 42 C.F.R. §§ 442.1, *et seq*. (for Medicaid) and 42 C.F.R. § 483.1, *et seq*. (for Medicare). The ROPs set forth health and safety standards, including rules regarding residents' rights, standards of care, physician and nursing services, facility quality, and ethics. Participating facilities are surveyed to ensure their compliance. In Missouri, these surveys are conducted by the Missouri Department of Health and Senior Services ("MDHSS").

The surveys are comprehensive, and thus, deficiencies are common. Deficiencies are rated by level of severity and scope, measured by "potential" and "actual" harm to the facility's residents. *See* 42 C.F.R. § 488.404. For deficient facilities, the Secretary of DHHS is authorized to impose sanctions. These sanctions include "termination" from the Medicare and Medicaid programs in the most serious cases. 42 U.S.C. § 1395i-3(h). The statute only specifically authorizes termination where the health and safety of residents is not in immediate jeopardy. *See*

42 U.S.C. § 1395i-3(h). Terminated facilities are entitled to an administrative appeal, but there is no mechanism for a stay pending that appeal.

In 2022, Plaintiff was surveyed and placed on the Special Focus Facility ("SFF") Program, a program for enforcing requirements for skilled nursing facilities where the facility has been identified as having substantially failed to meet such requirements. It has remained in the SFF program since that time. On June 1, 2023, Liberty came under new management, leading to the steady improvement of its conditions.

On December 17, 2024, there was an incident at Liberty where a resident fell. According to Plaintiff, the resident was wearing a gait belt and standing at the parallel bars with a physical therapy assistant standing to her left with two points of contact and a Certified Occupational Therapy Assistant to her right at knee level. Therapy staff reported hearing a pop and the resident's knee buckled; Liberty immediately sent her to the hospital. While at the hospital and while the resident was on narcotic medication for the pain, the resident's daughter took a video of her explaining what happened prior to the fall; she represented that all therapy staff were 15 feet away from her during the fall. Plaintiff conducted an investigation afterwards, where it concluded based upon 4 witness statements that the therapy staff had not left the resident alone and had provided an appropriate standard of care leading up to the fall. The fall was reported to MDHSS and the video provided; Plaintiff was cited with a deficiency constituting immediate resident jeopardy.

On February 10, 2024, MDHSS formally notified Plaintiff of its deficiency findings. In the letter it (1) requested a plan of correction be submitted within 10 days, (2) offered access to the internal administrative dispute resolution process, and (3) advised that a revisit would be conducted to determine substantial compliance. MDHSS specifically stated that the conditions previously classified as immediate jeopardy "had been lowered to isolated deficiencies that

constitute actual harm that is not immediate jeopardy" and that "the facility had implemented measures, in accordance with federal requirements, that adequately addressed the immediate jeopardy." The letter advised Liberty that if the Centers for Medicare and Medicaid Services determined termination was necessary, it would be provided with separate notice, and, if Liberty remained substantially noncompliant, MDHSS was recommending termination on June 24, 2025.

Liberty timely provided MDHSS with its plan of correction, as recognized by MDHSS in the February 14, 2025 letter. In this same letter MDHSS, stated that a revisit would occur within 60 days. However, on February 20, 2025, Plaintiff received a letter from the Centers for Medicare and Medicaid Services, informing it that the Secretary of DHHS was involuntarily terminating Liberty from its Medicare Provider Agreement, effective March 7, 2025. Defendants represented to the Court that the termination is based on Plaintiff's status as an SFF participant, its history of deficiencies, the December 2024 fall, and another resident fall and an elopement since that time. Plaintiff asserted that any past deficiencies have been remedied and that it has been compliant with requirements that it submit plans for abatement and correction following each incident.

Plaintiff is appealing through the internal administrative appeals process, however, in the meantime, absent Court order, it will be forced to relocate its residents. Plaintiff submitted physician's declarations from Drs. Ramilio Gatpia, the medical director at Liberty, and James Powers, who explain that sudden changes in living situations for elderly and disabled individuals can result in "transfer trauma." Dr. Gatpia identifies several specific patients he believes would be impacted and Dr. Powers lists several types of disability which may make transfer trauma more likely and apply to many of Liberty's residents.

In its Complaint, Plaintiff asserts six claims:

I. Violation of the Medicare Act (42 U.S.C. § 1395i-3(h)(2));

4

II. Violation of the Medicaid Act (42 U.S.C. § 1396(h)(3));

III. Violation of Procedural Due Process under the Fifth and Fourteenth Amendments;

IV. Violation of the Medicare Act and Administrative Procedure Act (42 U.S.C. § 1395hh(a)(2); 5 U.S.C. §§ 553, *et seq.* and 706);

V. Arbitrary and Capricious Agency Action (5 U.S.C. § 706(2));

VI. Violation of Equal Protection under the Fifth and Fourteenth Amendments.

Plaintiff has applied for a TRO based, in part, on the irreparable harm of the trauma that would result to Plaintiff's elderly and infirm residents if they were forced to move from their homes with little warning. The Court analyzes below the appropriateness of a TRO under the circumstances.

## II. DISCUSSION

The Court must determine whether a temporary restraining order is an appropriate measure in this case. To do so, the Court must consider "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).[1] Likelihood of success on the merits is an important factor, the absence of which "strongly suggests that preliminary injunctive relief should be denied." *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013) (quotation omitted). However, a temporary restraining order is often "too early a stage of the proceedings to woodenly assess a movant's probability of success on the merits with mathematical precision." *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 624-25 (8th Cir. 1987) (citations omitted). "Rather, the essential inquiry in weighing the propriety of issuing a preliminary injunction is whether the balance of other factors tips decidedly toward the movant

---

[1] *Dataphase* discussed issuance of a preliminary injunction, but the Eighth Circuit has explained "the standard for analyzing a motion for ["TRO"] is the same as a motion for a preliminary injunction[.]" *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022).

and the movant has also raised questions so serious and difficult as to call for more deliberate investigation." *Id.* Ultimately, "no single factor in itself is dispositive; in each case all the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Calvin Klein Cosms. Corp. v. Lenox Lab'ys, Inc.*, 815 F.2d 500, 503 (8th Cir. 1987); *see also O'Connor v. Peru State Coll.*, 728 F.2d 1001, 1002 (8th Cir. 1984).

### A. Irreparable Harm, Public Interest, and Balance of Harms

First, Plaintiff asserts that its vulnerable residents would undergo immediate and irreparable harm because of "transition trauma," leading to both emotional and physical harm. Further, Plaintiff asserts its residents will also be harmed by the lack of bed space in the area, causing stress through the short notice in locating accommodations and by potentially forcing some residents to find accommodations far from their families and friends.

Several courts have recognized transition trauma as a harm to nursing home residents to leave familiar people and surroundings. In *Lexington Mgmt. Co. v. Missouri Dep't of Soc. Servs.*, the Court found that transferring vulnerable nursing home residents from their homes could result in "transfer trauma," a condition "characterized by a refusal to eat, a general sense of disorientation, or a loss of one's will to live" and sometimes resulting in death, which "commonly afflicts nursing home residents who are suddenly forced to vacate familiar surroundings." 656 F. Supp. 36, 41 (W.D. Mo. 1986) ("This transition, particularly the difference in the personalities of the people who would be staffing the facilities, could be extremely disorienting and distressing. In addition, the transition would move the residents far away from their families and friends, thereby cutting down their number of visitors and generally damaging their external support systems."). The Supreme Court acknowledged these harms in *O'Bannon v. Town Court Nursing Center*, finding that forcing vulnerable individuals in skilled nursing facilities to relocate could result in

6

both emotional and physical harm. *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 787 (1980)[2]; *see also Villines v. Division of Aging and Mo. Dept. of Social Servs.*, 722 S.W.2d 939, 946 (Mo. 1987) (en banc); *Wayside Farms, Inc. v. Department of Health and Human Services*, 663 F. Supp. 945, 954 (N.D. Ohio 1987); *Hathaway v. Mathews*, 546 F.2d 227, 231 (7th Cir. 1976); *Burchette v. Dumpson*, 387 F. Supp. 812, 819 (E.D.N.Y. 1974).

If Plaintiff's termination of certification is effective today not only are its residents at risk of these harms in the abstract, but Plaintiff has also provided declarations from physicians indicating that several of its residents are at specific risk of transition trauma if they are moved today. (*E.g.*, Doc. 5-5, Doc. 5-7.) The Court joins other courts in recognizing this as a significant potential harm

Second, Plaintiff asserts that its business at Liberty will be effectively destroyed if it is forced to relocate all of its residents. It could take years to complete the administrative appeals process, at which time, the facility would have no income and be forced to shut down to avoid the costs, rather than be able to fully participate in and complete its appeal. In essence, if Plaintiff's certification is terminated, its business will be forced to close. This is also an irreparable harm.

There is a public interest in the health and safety of vulnerable populations, including the elderly and those requiring skilled nursing care. The emotional and physical harm the residents would have to undergo if they were forced to move represents a cognizable public interest.

On balance, the harms of allowing Defendants to proceed with Plaintiff's termination outweigh the harms of imposing the injunction. Plaintiff has demonstrated a purported concession

---

[2] In this case the Supreme Court found that the residents of a skilled nursing facility closed due to the denial of Medicare/Medicaid funding could not assert their own due process claim because they were third parties to the action, unlike the facility itself. *Id.* Nonetheless, the Court acknowledged their harms and suffering. *Id.* ("Thus, whether they are private patients or Medicaid patients, some may have difficulty locating other homes they consider suitable or may suffer both emotional and physical harm as a result of the disruption associated with their move.")

by MHSS, the Defendant who conducted the survey and made the initial allegations of deficiencies against Liberty, that there is no ongoing immediate jeopardy at Liberty.  Plaintiff demonstrated that it conducted its own internal investigation and, as requested by MHSS, it timely submitted a proposal for a plan to ensure any deficiencies were corrected.  And during the hearing, Defendants did not identify any present risks to health and safety at Liberty which cause immediate jeopardy to any of its residents.  The jeopardy on which they rely is based on past events and conditions, some of which are disputed and some of which have allegedly been remedied.  While there may still be some risk of harm to residents by the alleged deficiencies, the residents would also be harmed by being forced to move out of their care facilities on short notice, pending the resolution of the administrative appeals process.  The Court finds the potential harm to residents by being forced to relocate under these circumstances outweighs the risks of allowing them to remain.  The balance of harms and the severity of the immediate harms to the residents strongly favors not uprooting the residents on this timeline.

**B. Likelihood of Success on the Merits**

While Plaintiff asserts several claims, here, the Court focuses on its Medicare and Medicaid Act (Counts I and II) and Procedural Due Process (Count III) claims.

*1. Violations of Medicare / Medicaid Acts*

The Secretary of DHHS is authorized to impose sanctions for facilities which have been found to be deficient, that is, out of compliance with the ROFs.  42 C.F.R. § 488.  These sanctions include "termination" from the Medicare and Medicaid programs in the most serious cases, where the State finds deficiencies resulting in the immediate jeopardization of the health or safety of its residents.  *See* 42 U.S.C. § 1395i-3(h).  The Medicare and Medicaid Acts specifically authorize this remedy for facilities where the health and safety of residents is not in immediate jeopardy.

*See* 42 U.S.C. § 1395i-3(h). Several courts have been persuaded that the language of these Acts suggests termination is only valid under situations involving immediate jeopardy. *See Claridge House, Inc. v. United States Dep't of Health & Human Servs.*, 795 F. Supp. 1393, 1403-04 (S.D. Ohio 1991); *Mountview Nursing & Rehabilitation Center, Inc. v. United States Dep't of Health & Human Servs.*, Civ. A. No. 1:CV–93–1692, slip op. at 6-7 (M.D. Pa. Nov. 17, 1993).

At the same time, the Medicare and Medicaid Acts and the regulations promulgated to aid in the execution of them are extensive and occasionally ambiguous. Despite this language related to terminations, a savings clause in both Acts says "[n]othing . . . shall be construed as restricting the remedies available to the Secretary to remedy a skilled nursing facility's deficiencies." 42 U.S.C. § 1395i–3(h)(2)(A); 42 U.S.C. § 1396r(h)(3)(B). One subsection of the Medicare Act, which does not appear in the Medicaid Act, authorizes the termination of any provider regardless of immediate jeopardy where the facility "fails to comply substantially" with the provisions of its agreement with the DHHS. 42 U.S.C. § 1395cc(b)(2).

Plaintiff asserts that the immediate jeopardy at Liberty has been remedied prior to the exit conference on January 24, 2025. Plaintiff also asserts that MDHSS confirmed that fact in the February 10, 2025 letter. Based on the record before it, the Court has doubts that Plaintiff's residents are in any immediate jeopardy.

The exigency of time required for this order has constrained the Court from conducting a legal analysis with mathematical precision or providing Defendants time to brief this issue, as is the nature of temporary restraining orders. However, the statutory language of both acts suggests that Plaintiff's argument is at least plausible. Consistent with the Eighth Circuit's holding in *General Mills*, this plausibility of success is sufficient for the purposes of granting this order in light of the severity of the potential harms Plaintiff alleges.

*2. Due Process*

Whether procedural due process is implicated in state action depends upon a showing that (1) there exists a protected life, liberty, or property interest at stake, and (2) that sufficient process was not provided to protect that interest. *Krentz v. Robertson*, 228 F.3d 897, 902 (8th Cir. 2000). Process usually comes in the form of notice and an appropriate opportunity to be heard. *Jones v. Flowers*, 547 U.S. 220, 223 (2006).

Contracts can be a property interest protected by the due process clause where they are "characterized by a quality of extreme dependence" or "permanence" and/or where the contract "includes a provision that the state entity can terminate the contract only for cause." *Omni Behav. Health v. Miller,* 285 F.3d 646, 652 (8th Cir. 2002) (quoting *Unger v. National Residents Matching Program*, 928 F.2d 1392, 1399 (3d Cir. 1991)). Medicare and Medicaid Certifications are based on contracts between the facility and the Secretary of the DHHS. The statutes discussed above provide specific circumstances under which termination is available, suggesting some degree of permanence and termination only for cause. This suggests there is a likelihood that Plaintiff can demonstrate a property interest in its Medicare and Medicaid certification.

"Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Wilkinson v. Austin*, 545 U.S. 209, 226 (2005) (quoting *Baldwin v. Hale*, 1 Wall. 223, 233 (1864)). Plaintiff does not challenge the use of the letter as notice for termination of Liberty; it challenges the lack of pre-enforcement opportunity to be heard.

"The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914). The Due Process Clause requires not just an opportunity to be heard, but an opportunity "at a meaningful time and in a meaningful manner." *Mathews v.*

*Eldridge*, 424 U.S. 319, 333 (1976).  In considering what process is due, courts must weigh (1) the private interest affected; (2) the risk of erroneous deprivation; (3) and the government's interest, including the fiscal and administrative burdens of additional procedures.  *Id.* at 335.  Procedural due process is "flexible" and highly dependent on the demands of a particular situation.  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

The Supreme Court has "consistently has held that some form of hearing is required before an individual is finally deprived of a property interest." *Mathews*, 424 U.S. at 333.  "A claim to a predeprivation hearing as a matter of constitutional right rests on the proposition that full relief cannot be obtained at a postdeprivation hearing." *Id.* at 331. Whether a predeprivation hearing is impracticable is also a consideration in whether it is necessary under the circumstances. *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir.1984).  Where there is immediate concern for safety and well-being, predeprivation process may not be practicable and is therefore not required by the Due Process clause. *Nance v. Humane Soc'y of Pulaski Cnty.*, 667 F. App'x 879 (8th Cir. 2016).  The length of the deprivation prior to a postdeprivation hearing is also a factor to consider. *Fusari v. Steinberg*, 419 U.S. 379, 389 (1975); *see also Matthews*, 424 U.S. at 341.

The termination of Liberty's certification essentially forces Liberty to close, displacing all its residents and halting any income.  Based on the circumstances as presented to the Court, a postdeprivation hearing cannot be meaningful process for the termination of Liberty's certification. By the end of the administrative appeals process, which could take years, Liberty would have to rebuild its business from the ground up and the transition trauma to the residents would have long since occurred.  And, as discussed above, the Court questions whether an immediate risk of safety and well-being exists.  Therefore, (1) there is not an apparent exigency justifying the need for immediate action without some degree of predeprivation process and (2)

postdeprivation process may not sufficiently protect Plaintiff's property interest. Therefore, there is a likelihood that Plaintiff will succeed on the merits of this claim.

With the record and briefing before the court at this time, the balance of the *Dataphase* factors tips decidedly towards the movant such that a TRO of a short duration is appropriate to preserve the status quo and prevent the immediate harms to Plaintiff's residents while the Court conducts a more deliberate analysis.

### III.  CONCLUSION

Because Plaintiff has demonstrated irreparable harm and likelihood of succeeding on the merits of its Medicare and Medicaid Act and Due Process Claims, the Court **GRANTS** the Plaintiff's Application for a Temporary Restraining Order.  (Doc. 4.)

Defendants are enjoined **until the end of the day on Thursday, March 13, 2025,** from terminating the Medicare or Medicaid provider agreements of Liberty or taking other action which would result in Liberty's termination from the Medicare and Medicaid Programs pending a decision on the underlying merits of this case.  Under these circumstances, the Court concludes no bond should be required.  The Court will consider whether to extend the TRO further pending input from the parties.  Any briefing by Defendants shall be filed by the close of business on March 12, 2025.

**IT IS SO ORDERED**

DATE:  March 7, 2025

/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
UNITED STATES DISTRICT COURT