# UNITED STATES DISTRICT COURT FOR
# THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| GLEN HENDREN DRIVE HEALTHCARE, LLC d/b/a LIBERTY HEALTH AND WELLNESS )<br><br>Plaintiff, )<br><br>v. )<br><br>ROBERT F. KENNEDY, JR.,[1] SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, )<br><br>Defendants. ) | Case No. 25-00162-CV-W-BP |

## ORDER DENYING (1) PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND (2) PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION HEARING

Plaintiff Glen Hendren Drive Healthcare, LLC, d/b/a Liberty Health and Wellness, ("Liberty") is a facility licensed to provide skilled nursing services to its residents, many of whom are Medicare or Medicaid beneficiaries. Defendants are terminating Plaintiff's Medicare/Medicaid certificate, causing Liberty to cease operations. Plaintiff claims the termination was done (1) in violation of a variety of federal and state laws involving Medicare and Medicaid, (2) in violation of the Equal Protection Clause, and (3) without sufficient due process. On March 7, 2025, following a telephone conference with the parties, the Court granted Plaintiff a six-day Temporary Restraining Order. The Court stated it would consider extension of the Temporary Restraining order pending briefing from Defendants which the Court has now received. For the reasons set forth below, Plaintiff's Application for Temporary Restraining Order ("TRO")

---

[1] Robert F. Kennedy, Jr. became the Secretary of the United States Department of Health and Human Services on February 13, 2025, and therefore, pursuant to Rule 25(d), Kennedy should be substituted as the Defendant in this matter.

and Preliminary Injunction, (Doc. 4), and Plaintiff's Motion for Preliminary Injunction Hearing, (Doc. 22), are **DENIED**.

## I.  BACKGROUND

In coming to the facts herein, the Court relies on representations made by the parties during the telephone conference as well as allegations in Plaintiff's Verified Complaint, (Doc. 1), Application for Temporary Restraining Order, (Doc. 4), Plaintiff's Supplement to its Memorandum in Support of its Application of Temporary Restraining Order, (Doc. 14), and Defendants' Suggestions of Federal Defendants in Opposition to Plaintiff's Application for Temporary Restraining Order, (Doc. 22).

The majority of Plaintiff's residents are beneficiaries of Medicare or Medicaid and rely on these programs to receive care at Liberty.  The Medicare Program is a federal health insurance program supporting the elderly which, among other services, covers treatment in skilled nursing facilities for those who require it.  The Medicaid Program is a joint federal and state program which provides, among other services, skilled nursing facility benefits to those who require them. Facilities in Missouri which participate in Medicare or Medicaid Programs are required to enter into "provider agreements" with the Secretary of the Department of Health and Human Services ("DHHS") and with Missouri Department of Social Services ("MDSS"); they must also be certified for participation pursuant to federal regulations, commonly known as the Requirements of Participation ("ROPs"), set out in 42 C.F.R. §§ 442.1, *et seq*. (for Medicaid) and 42 C.F.R. § 483.1, *et seq*. (for Medicare).  The ROPs set forth health and safety standards, including rules regarding residents' rights, standards of care, physician and nursing services, facility quality, and ethics.  Participating facilities are surveyed to ensure their compliance.  In Missouri, these surveys are conducted by the Missouri Department of Health and Senior Services ("MDHSS").

The surveys are comprehensive, and thus, deficiencies are common. Deficiencies are rated by level of severity and scope, measured by "potential" and "actual" harm to the facility's residents. *See* 42 C.F.R. § 488.404. For deficient facilities, the Secretary of DHHS is authorized to impose sanctions. These sanctions include "termination" from the Medicare and Medicaid programs in the most serious cases. 42 U.S.C. § 1395i-3(h).

Providers have several options in disputing or curing deficiencies identified by the DHHS and MDHSS including the submission of a plan of correction for each deficiency, an informal dispute resolution process, and administrative appeals process through the Secretary's Departmental Appeals Board.

In 2022, Plaintiff was surveyed and placed on the Special Focus Facility ("SFF") Program, a program for enforcing requirements for skilled nursing facilities where the facility has been identified as having substantially failed to meet such requirements. It has remained in the SFF program since that time. On June 1, 2023, Liberty came under new management, leading to some improvement of its conditions, though Liberty has continued to incur serious violations.

On December 17, 2024, there was an incident at Liberty where a resident fell, resulting in broken bones. According to Plaintiff, the resident was properly supervised by therapy staff, while Defendants represent that the resident was not properly supervised and should not have been eligible for that form of therapy in the first place. (*compare* Doc. 5, p. 12-13 *with* Doc. 23, ¶¶ 22-25.) In January 2025, there was a second incident where an improper patient transfer led to another resident fall that resulted in a broken ankle. (Doc. 23, ¶¶ 22, 27.) In February 2025, another resident was not properly supervised by Plaintiff's staff and eloped, resulting in the resident being sent to the emergency room; Defendants claim Plaintiff failed to either search for the resident or alert the proper authorities and did not properly record the incident as an elopement. (Doc. 23, ¶¶

34, 36, 39-41.) Additionally, Defendants lay out a series of other violations including Plaintiff's failure to properly distribute medication, failure to properly bathe and maintain the personal hygiene of its vulnerable residents, failure to properly observe infection protocol, staff theft of patient property, and one instance of a patient dying after suffering pressure wounds and arriving at the hospital covered in urine and feces. (*See*, *e.g.*, Doc. 23, ¶¶ 10, 12-13, 16, 21, 40, 42-44.)

On February 10, 2024, MDHSS formally notified Plaintiff of its deficiency findings. In the letter it (1) requested a plan of correction be submitted within 10 days, (2) offered access to the internal administrative dispute resolution process, and (3) advised that a revisit would be conducted to determine substantial compliance. MDHSS specifically stated that the conditions previously classified as immediate jeopardy "had been lowered to isolated deficiencies that constitute actual harm that is not immediate jeopardy" and that "the facility had implemented measures, in accordance with federal requirements, that adequately addressed the immediate jeopardy." The letter advised Plaintiff that if the Centers for Medicare and Medicaid Services determined termination was necessary, it would be provided with separate notice, and, if Plaintiff remained substantially noncompliant, MDHSS was recommending termination on June 24, 2025.

Plaintiff timely provided MDHSS with its plan of correction, as recognized by MDHSS in the February 14, 2025 letter. In this same letter MDHSS, stated that a revisit would occur within 60 days. However, on February 20, 2025, Plaintiff received a letter from the Centers for Medicare and Medicaid Services, informing it that the Secretary of DHHS was terminating Plaintiff from its Medicare Provider Agreement, effective March 7, 2025. Defendants represented to the Court that the termination is based on Plaintiff's status as an SFF participant, its history of deficiencies, the December 2024 fall, another resident fall, and an elopement since that time. Plaintiff asserted that

4

any past deficiencies have been remedied and that it has been compliant with requirements that it submit plans for abatement and correction following each incident.

Plaintiff is appealing the termination through the internal administrative appeals process; however, in the meantime, absent Court order, it will be forced to relocate its residents. Plaintiff submitted physician's declarations from Drs. Ramilio Gatapia, the medical director at Liberty, and James Powers, who explain that sudden changes in living situations for elderly and disabled individuals can result in "transfer trauma." (Docs. 5-6, 5-7.) Dr. Gatapia identifies several specific patients he believes would be impacted and Dr. Powers lists several types of disability which may make transfer trauma more likely and apply to many of Liberty's residents. (Docs. 5-6, 5-7.)

In its Complaint, Plaintiff asserts six claims:

I. Violation of the Medicare Act (42 U.S.C. § 1395i-3(h)(2));

II. Violation of the Medicaid Act (42 U.S.C. § 1396(h)(3));

III. Violation of Procedural Due Process under the Fifth and Fourteenth Amendments;

IV. Violation of the Medicare Act and Administrative Procedure Act (42 U.S.C. § 1395hh(a)(2); 5 U.S.C. §§ 553, *et seq.* and 706);

V. Arbitrary and Capricious Agency Action (5 U.S.C. § 706(2));

VI. Violation of Equal Protection under the Fifth and Fourteenth Amendments.

Plaintiff has applied for a TRO based, in part, on the irreparable harm of the trauma that would result to Plaintiff's elderly and infirm residents if they were forced to move from their homes with little warning. The Court analyzes below the appropriateness of a TRO or Preliminary Injunction under the circumstances. Plaintiff has also asked for a hearing on the matter, but pursuant to the Court's analysis below, the Court concludes a hearing is not necessary as the issues before it are issues of law, not issues of fact.

## II. DISCUSSION

For the Court to consider the merits of a TRO or preliminary injunction, it first must have jurisdiction. Plaintiff asserts this Court has jurisdiction because its claims arise under federal law. (Doc. 1, p. 5, ⁋ 3 (citing 28 U.S.C. § 1331).) However, the Medicare Act expressly excludes claims "arising under" the Medicare Act from jurisdiction under 28 U.S.C. § 1331 by adopting subsection 42 U.S.C. § 405(h) into the Act. 42 U.S.C. § 1395ii. "To obtain judicial review under § 405(g), a party must comply with '(1) a nonwaivable requirement of presentation of any claim to the Secretary, and (2) a requirement of exhaustion of administrative review, which the Secretary may waive.'" *Cathedral Rock of N. Coll. Hill, Inc. v. Shalala*, 223 F.3d 354, 359 (6th Cir. 2000) (citations omitted). "[T]o be true to the language of the statute, the inquiry in determining whether § 405(h) bars federal-question jurisdiction must be whether the claim 'arises under' the Act, not whether it lends itself to a 'substantive' rather than a 'procedural' label." *Heckler v. Ringer*, 466 U.S. 602, 615 (1984) (citing *Mathews v. Eldridge*, 424 U.S. 319, 327 (1976)). A claim arises under the Medicare Act if the claim derives "both ... standing and ... substantive basis" from the Act, or if the claim is "inextricably intertwined with [the plaintiff's] claim . . . ." *Blue Valley Hosp., Inc. v. Azar*, 919 F.3d 1278, 1283 (10th Cir. 2019) (cleaned up).

Further, the prohibition against federal question jurisdiction extends beyond claims explicitly brought under the Medicare Act. "[C]laims arising under other statutes may be barred by section 405(h) if they are 'inextricably intertwined' with benefit determinations under the Medicare Act." *Clarinda Home Health v. Shalala*, 100 F.3d 526, 529 (8th Cir. 1996) (quoting *Heckler v. Ringer*, 466 U.S. 602 (1984)). While *Ringer* dealt with benefits claims rather than the termination of a provider agreement and certification, the Supreme Court concluded that claims under the Administrative Procedure Act and the Due Process Clause were also barred by § 405

because, at their core, the claims were based on the assertion that the plaintiffs should have received benefits. *Ringer*, 466 U.S. at 614. In *Blue Valey Hospital, Inc. v. Azar*, the Tenth Circuit came to the same conclusion regarding the plaintiff's Due Process claims because the Medicare Act "provid[ed] both the standing and the substantive basis for the presentation of their constitutional contentions." 919 F.3d at 1284 (quoting *Weinberger v. Salfi*, 422 U.S. 749, 760-61 (1975)). Further, the type of relief Plaintiff seeks is irrelevant to this determination; jurisdiction is lacking even where the plaintiff only requests declaratory and injunctive relief. *Ringer*, 466 U.S. at 615.

Nonetheless, the Supreme Court has recognized a court may exert jurisdiction despite a plaintiff's failure to exhaust under the exception described in *Matthews v. Eldridge* ("the *Eldridge* exception"), if it "(1) raise[s] a colorable constitutional claim collateral to his substantive claim of entitlement; (2) show[s] that he would be irreparably harmed by enforcement of the exhaustion requirement; and (3) show[s] that the purposes of the exhaustion requirement would not be served by requiring further administrative procedures." *Thorbus v. Bowen*, 848 F.2d 901, 903 (8th Cir. 1988) (citing *Mathews*, 424 U.S. at 329-31 (further citations omitted)). "For a claim to be collateral, it must not require the court to immerse itself in the substance of the underlying Medicare claim or demand a factual determination as to the application of the Medicare Act." *Blue Valley Hosp.*, 919 F.3d at 1285 (quoting *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 501 (5th Cir. 2018) (quotation omitted)). "The claim 'must seek some form of relief that would be unavailable through the administrative process,' rather than the 'substantive, permanent relief that the plaintiff seeks ... through the agency appeals process.'" *Id.*

Plaintiff has not completed the exhaustion requirements, and the Secretary has not waived the requirement, so where § 405 applies to Plaintiff's claims, the Court lacks jurisdiction unless

the *Eldridge* exception's elements are met. In light of this law, the Court will consider each of Plaintiff's claims.

### A. Medicare and Medicaid Act Claims (Counts I and II)

In Count I, Plaintiff asserts that Defendants violated the Medicare Act, so the claim clearly arises under the Medicare Act and § 405 applies. This count cannot fulfill the requirements of the *Eldridge* exception, because Plaintiff claims Defendants violated the Medicare Act in terminating Plaintiff's provider agreement, and the basis for the violation is not collateral to the administrative proceedings. To challenge the application of the Act to Plaintiff is to challenge the underlying factual basis for the termination. Therefore, the Court does not have jurisdiction over Count I.

This same logic leads to the conclusion that the Court also does not have jurisdiction for Plaintiff's Medicaid claims. Because all of Plaintiff's claims stem from the same termination, they are all inextricably intertwined with Plaintiff's Medicare claim. The determination which led to the termination of Plaintiff's Medicare provider agreement and certification provided the exact same basis for Plaintiff's termination under Medicaid; notification even came through the same letter with the same reasoning. Nothing in Plaintiff's briefing (other than that they are separate Counts) suggests the Court should consider them separately or are based on different facts or standards. (*See* Doc. 5, p. 2, n. 2 ("Many, but not all of the 'survey, certification, and enforcement' provisions addressed [] have parallel counterparts in the Medicare and Medicaid Acts; therefore, if both are addressed together in the text, the counterparts are identical or have no material differences."); *see also* Doc. 5, p. 3 (referring inter that Medicare and Medicaid certification is based on the same survey).) Therefore, Plaintiff's Medicaid claim is inextricably linked with its Medicare claim and § 405 applies. Again, whether Defendants were authorized by the Medicaid Act to terminate Plaintiff necessarily involves and challenges the factual application of this act to

Plaintiff's case, so the Medicaid Act claim in Count II also cannot be collateral.  Therefore, the *Eldridge* exception cannot apply, and the Court does not have jurisdiction.

**B.  Administrative Procedure Act, "Arbitrary and Capricious Agency Action," and Equal Protection (Counts IV-VI)**

Counts IV-VI are also subject to § 405. In *Weinberger v. Salfi*, the Supreme Court broadly construed the "arising under" language in § 405 and concluded that a plaintiff bringing a constitutional challenge to the eligibility statute which led to the denial of the claimant's benefits was a claim "arising under" Title II of the Social Security Act within the meaning of § 405.  422 U.S. at 760.  The Court stated that

> It would, of course, be fruitless to contend that appellees' claim is one which does not arise under the Constitution, since their constitutional arguments are critical to their complaint.  But it is just as fruitless to argue that this action does not also arise under the Social Security Act. . . . To contend that such an action does not arise under the Act whose benefits are sought is to ignore both the language and the substance of the complaint and judgment.

*Id.* at 760-61.  Several Circuit Courts have applied this logic directly to statutory and constitutional challenges to the Medicare Act.  For example, in *Blue Valley Hospital, Inc. v. Azar*, the Tenth Circuit concluded that the plaintiff's due process claim stemming from the termination of a provider agreement, while based on the Constitution, arose under the Medicare Act for purposes of § 405(h). 919 F.3d 1278, 1283-84 (10th Cir. 2019) (quoting § 405(h)) (citing *Salfi*, 422 U.S. at 760-61) ("[T]he 'sweeping and direct' language of § 405(h) . . . broadly states "[n]o action ... shall be brought to recover on any claim arising under the Medicare Act [and] that language alone disposes of [plaintiff's] attempt to proceed under § 1331.")  In *Manakee Professional Medical Transfer Service, Inc. v. Shalala*, the Sixth Circuit held that a plaintiff's due process claim related to whether its ambulance rides were covered by Medicare was inextricably intertwined with the

9

Medicare Act even though plaintiff challenged the process through which this determination was made. 71 F.3d 574, 579 (6th Cir. 1995) (citing *Ringer*, 466 U.S. at 579.)

The Court joins these decisions and concludes that Plaintiff's Administrative Procedure Act, Arbitrary and Capricious Agency Action, and Equal Protection Claims (Counts IV-VI) are inextricably intertwined with the Medicare Act. Plaintiff's standing is predicated on its termination under the Medicare and Medicaid Acts, and these claims involve the termination decisions, as well as the processes and procedures of these Acts. Accordingly, § 405(h) applies.

The Court further concludes the *Eldridge* exception does not apply because these claims cannot be considered collateral to the underlying administrative proceedings, as *Eldridge* requires. Plaintiff's Administrative Procedure Act challenges the methods under which Defendants made the determination that resulted in Plaintiff's termination. To challenge these methods and their application is to challenge the basis for and ultimate conclusion of the administrative proceeding. Plaintiff's Arbitrary and Capricious Agency Action claim challenges the outcome of the proceedings as a violation of the Medicare and Medicaid Acts and the procedures that govern their enforcement. This cannot be collateral, because challenging the substance of the termination as a violation of statutes and procedures necessarily requires engaging with the substance of Plaintiff's underlying administrative claim. Finally, Plaintiff's Equal Protection claim also cannot be collateral because claiming that Plaintiff was treated differently than other similarly situated providers requires assessing the factual substance of Defendants' decision to terminate Plaintiff. Because these claims are simply other ways for Plaintiff to challenge the basis for Defendants' termination of Plaintiff's provider agreement and certification, they are not collateral, and the *Eldridge* exception does not apply; the Court does not have jurisdiction over Counts IV-VI.

## C. Due Process Claim (Count III)

Section 405 also applies to Plaintiff's Due Process claim. Consistent with *Blue Valley Hospital* and *Manakee Professional Transport Service*, Plaintiff's claim that it was denied due process is inextricably intertwined with its termination under the Medicare and Medicaid Acts. Its standing and the substantial basis of this claim is based on the procedure it was denied in following its termination by Defendants.

Regarding the *Eldridge* exception, Plaintiff's due process claim is at least arguably collateral, in that it contends the pretermination procedures employed are insufficient under the Due Process Clause and does not challenge the merits of Defendants' decision to terminate Plaintiff. However, even if Plaintiff's due process claim is collateral, it is not colorable, so the *Eldridge* exception cannot apply.

Determining which procedure is constitutionally due requires an analysis of three factors: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (citing *Goldberg v. Kelly*, 397 U.S. 254, 263-271 (1970)). Several Circuit Courts have determined that, considering these factors, there is no right to a pre-termination administrative hearing.

For example, the Third Circuit, in *Town Court Nursing Center, Inc. v. Beal*, concluded due process does not require a pre-termination hearing before the federal government terminates a Medicare provider agreement and concluded that pre-existing Medicare and Medicaid procedures are sufficient. 586 F.2d 266, 277 (3d Cir. 1978) (citing *Eldridge*, 424 U.S. at 349). The Seventh

Circuit concluded that "Medicare providers, like disability claimants in *Eldridge*, cannot raise a colorable constitutional claim of entitlement to a pre-termination hearing." *Northlake Cmty. Hosp. v. United States*, 654 F.2d 1234, 1242 (7th Cir. 1981). The Tenth Circuit has also "rejected the claim that due process requires a formal hearing prior to the termination of a provider's Medicare Certification." *Blue Valley Hosp., Inc. v. Azar*, 919 F.3d 1278, 1285 (10th Cir. 2019) (citing *Geriatrics, Inc. v. Harris*, 640 F.2d 262, 265 (10th Cir. 1981) ("There is ... no statutory or constitutional requirement that a hearing be conducted prior to the cessation of benefits.")). The Sixth and Eleventh circuits have also come to this conclusion. *In re Bayou Shores SNF, LLC*, 828 F.3d 1297, 1302 n.5 (11th Cir. 2016); *Cathedral Rock of N. Coll. Hill, Inc. v. Shalala*, 223 F.3d 354, 366 (6th Cir. 2000).

The overwhelming consensus of Circuit Court opinions convinces this Court that the current Medicare/Medicaid procedures sufficiently protect Plaintiff's right to due process. As a result, Plaintiff's claim is not colorable and therefore the Court does not have jurisdiction under the *Eldridge* exception.

### III. CONCLUSION

Because § 405 applies to Plaintiff's claims and they are not colorable nor collateral to the Medicare Act, the Court **DENIES** the Plaintiff's Application for a Temporary Restraining Order and Preliminary Injunction, (Doc. 4.), as well as the Motion for Preliminary Injunction Hearing, (Doc. 22).

**IT IS SO ORDERED**

/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
DATE: March 13, 2025    UNITED STATES DISTRICT COURT